NOT DESIGNATED FOR PUBLICATION

No. 126,466

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

KEITH E. OAKLEY,
*Appellant*.

MEMORANDUM OPINION

Appeal from Miami District Court; RICHARD FISHER, judge. Submitted without oral argument. Opinion filed September 5, 2025. Affirmed.

*Grace E. Tran*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., GARDNER and HURST, JJ.

WARNER, C.J.: The COVID-19 pandemic limited the extent to which Kansas courts, and other courts across the country, could conduct in-person proceedings. This case presents an example of the difficulties associated with that timeframe. The question here is whether the delay in this case—roughly three years from the filing of most charges to the jury trial, including about a year awaiting an in-person preliminary hearing—violated the defendant's constitutional right to a speedy trial. We conclude it did not.

Keith Oakley was charged with several serious crimes, including off-grid felony offenses, in 2019 and 2020. The pandemic intervened. Oakley requested that the preliminary hearing be conducted in person, and that in-person proceeding was not completed until February 2022. The case was eventually tried to a jury in early 2023, almost three years after most of the charges against him were filed. Before trial, Oakley moved to dismiss the charges against him, arguing that this delay was inherently unreasonable and violated his constitutional right to a speedy trial. The district court denied his request, the trial followed, and Oakley was convicted.

Oakley now argues that the district court erred when it denied his motion to dismiss. He also challenges the court's denial of a motion for a new trial based on evidence that Oakley claims was unduly prejudicial. After carefully reviewing the appellate record and the parties' arguments, we conclude the district court's rulings were sound and guided by the appropriate legal parameters. We thus affirm Oakley's convictions.

FACTUAL AND PROCEDURAL BACKGROUND

In February 2023, a jury found Oakley guilty of two counts of aggravated criminal sodomy and one count each of aggravated indecent liberties with a child, criminal restraint, and criminal damage to property. The conduct that led to these convictions occurred in December 2019. At that time, Oakley was living with the 10-year-old victim—referred to here under the pseudonym Jane—Jane's mother, and Jane's younger sibling. Oakley was not Jane's biological father, but he was married to Jane's mother.

At trial, witnesses testified about events that primarily took place on December 27 and 28, 2019. The facts giving rise to Oakley's convictions are known to the parties and largely tangential to the issues raised in this appeal. Highly summarized, Jane informed her mother that at some point that evening, after Oakley had been drinking alcohol with

2

friends at their home, Oakley attempted to kiss Jane and then restrained her in a bathroom and sexually assaulted her with his penis and orally. Jane's aunt found them in the bathroom, and Jane eventually told her mother what happened.

When confronted, Oakley denied that anything had happened and began throwing things, including his wedding ring. Jane's mother told Jane to get in the car, and Oakley followed them into the garage. As Jane's mother was backing out of the garage, Oakley tried to open the driver-side door, ripping the door handle off and then throwing it at the car. Once out of the driveway, Jane's mother pulled onto the side of the road in front of the house. She asked Jane "if it was true, if all of this had happened." Jane said "Yeah," and her mother called the police.

While parked in front of the house, Jane and her mother watched through a window as Oakley angrily packed a bag and carried the other child—who had been asleep in her room—out of the house and into his truck. Oakley then got out of the truck and walked towards the backyard. The police arrived about 10 minutes later.

After a while, Oakley surrendered to the police. He was interviewed at the police station and was charged with misdemeanor criminal damage to property that night.

A few days after the incident, Jane gave a forensic interview with an employee at the Kansas Department for Children and Families. And later in the investigation, a forensic scientist at the Kansas Bureau of Investigation found Oakley's DNA on a swab taken from Jane's pubic area.

*Oakley is charged, and the COVID-19 pandemic intervenes and delays the preliminary hearing.*

After being arrested in December 2019, Oakley remained in custody until January 2020, when he was released on bond. A preliminary hearing was set for March 5, but Oakley requested it be continued to accommodate his work schedule. A few weeks later, the district court continued the hearing again because of the COVID-19 pandemic.

On May 22, 2020, the State dismissed the original charge of criminal damage to property. The same day, it filed another complaint charging Oakley with aggravated criminal sodomy, aggravated indecent liberties with a child, and criminal damage to property.

Oakley demanded an in-person preliminary hearing. But because of the ongoing pandemic, the earliest available date for an in-person hearing was June 30, 2021. The State later requested that the hearing be continued to September 28, 2021, because one of the State's witnesses was unavailable in June—Oakley did not object to the request.

At the beginning of the September 2021 hearing, Oakley requested a continuance, stating that he did not believe that his attorney was prepared to effectively cross-examine the witnesses since he had not yet reviewed the recording of Jane's forensic interview. Oakley requested a "lengthy continuance, perhaps 90 days." The district court denied the request but allowed Oakley and his counsel to review the video in the jury room. About an hour and a half later, the court resumed the preliminary hearing.

Later in the day, the court determined that a second day of hearings was necessary to allow the parties to present the rest of their evidence. The court scheduled the second half of the hearing for October 29. This hearing date was continued twice because of

unavailable witnesses, with one continuance requested by the State and the other requested by Oakley.

The preliminary hearing was ultimately completed on February 16, 2022. Based on the testimony presented there, the case was bound over for trial, and the State successfully added two more charges against Oakley: an additional charge of aggravated criminal sodomy and a charge of criminal restraint.

*Oakley's case is tried in February 2023.*

The court held an arraignment on the amended complaint on March 9, 2022. Oakley pleaded not guilty to the five charges and requested a jury trial, and the court scheduled the trial for the week of August 22, 2022.

Three weeks before the scheduled trial, Oakley requested that the jury trial be continued for 90 days, stating that his attorney needed more time to review all the video evidence with Oakley before trial. The district court asked Oakley personally if he wanted to continue the trial, and Oakley said, "Yes." The court clarified that "technically our time standards are suspended for getting you to trial within X number of days" and asked Oakley whether he was waiving his right to a speedy trial. Oakley answered, "Yes." The court thus continued the trial to December 12, 2022, and clarified that the delay would "not be assessed against the state."

Five days before the rescheduled trial was set to begin, the State moved to continue the trial because the prosecutor had experienced a family emergency. The court granted the continuance over Oakley's objection and set the trial for February 21, 2023.

A few weeks later, the State moved for another continuance, arguing the State's new attorney needed more time to prepare for trial. Oakley objected. At a hearing on the

5

motion, the State argued that this was a "very extensive case"—with over a dozen witnesses, substantial forensic evidence, and extensive video footage—and argued that another 60-day continuance would not prejudice Oakley. The court denied the continuance and reiterated that Oakley's trial would begin on February 21, 2023.

On January 25, 2023, Oakley moved to dismiss the charges against him, alleging that the State had violated his constitutional right to a speedy trial. While the court recognized that over three years had passed since Oakley was initially charged with misdemeanor criminal damage to property in December 2019, Oakley had contributed to much of the delay and had "not been assertive in . . . pursuing his right to get this case resolved in a timely manner." The court thus denied Oakley's motion.

Oakley's jury trial began on February 21, 2023. After hearing all the evidence, the jury found Oakley guilty as charged. Oakley moved for a new trial for reasons we discuss later in this opinion, but the district court denied that motion. The court sentenced Oakley to 1,240 months' imprisonment.

## DISCUSSION

Oakley now appeals, challenging the district court's denial of his motion to dismiss on speedy-trial grounds and his posttrial motion for a new trial. After reviewing the district court's rulings and the surrounding record, we conclude the district court's decisions on both matters were correct and in conformance with the law.

1. *The State did not violate Oakley's constitutional right to a speedy trial.*

Oakley first argues that his constitutional right to a speedy trial was violated when his trial took place more than three years after his initial arrest in December 2019. Oakley asserts only this constitutional claim; he does not argue that his statutory right to trial was

6

violated—likely because the legislature suspended this statutory right during the COVID-19 pandemic. K.S.A. 22-3402(m) ("No time between March 19, 2020, and March 1, 2024, shall be assessed against the state for any reason.").

When determining whether a defendant's constitutional right to a speedy trial has been violated, appellate courts review the district court's factual findings for substantial competent evidence and review the ultimate legal conclusion de novo. *State v. Owens*, 310 Kan. 865, 868, 451 P.3d 467 (2019).

The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." Under the Fourteenth Amendment to the United States Constitution, this provision also applies to state court proceedings. *Klopfer v. North Carolina*, 386 U.S. 213, 222-23, 87 S. Ct. 988, 18 L. Ed. 2d 1 (1967). If the defendant's right to a speedy trial is violated, the "'only possible remedy'" is to dismiss any pending charges or reverse any convictions. *State v. Queen*, 313 Kan. 12, 29, 482 P.3d 1117 (2021); *State v. Clemence*, 36 Kan. App. 2d 791, 800, 145 P.3d 931 (2006), *rev. denied* 283 Kan. 932 (2007).

The constitutional right to a speedy trial attaches when a defendant is either formally charged or is arrested, whichever comes earlier. *State v. Gill*, 48 Kan. App. 2d 102, 107-08, 283 P.3d 236 (2012), *rev. denied* 298 Kan. 1205 (2014). Unlike the Kansas statute requiring a speedy trial, the constitutional speedy-trial provision is "considerably less rigid" and does not create a strict timeframe within which the State must bring a defendant to trial. *State v. Shockley*, 314 Kan. 46, 61, 494 P.3d 832 (2021); see *State v. Ford*, 316 Kan. 558, 560, 519 P.3d 456 (2022). Rather, what is "speedy" is relative to each defendant and the circumstances of the case. *Barker v. Wingo*, 407 U.S. 514, 521-22, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).

In *Barker*, the United States Supreme Court laid out four nonexclusive factors that courts must address when analyzing this type of claim: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant. 407 U.S. at 530.

*Length of delay*

This court first considers the length of delay to determine, as a threshold matter, whether that duration gives rise to a concern that implicates the defendant's constitutional right to a speedy trial. Oakley was originally arrested on December 28, 2019, and his case was not tried until February 21, 2023—roughly 38 months later.

The State argues that this court should not consider in its speedy-trial analysis the time from when Oakley was initially arrested in December 2019 to the time the State dismissed this first case against him. Rather, the State argues, this court should only consider the delay beginning on May 22, 2020—when the State filed the second, more serious, complaint against Oakley.

But in general, once the constitutional right to a speedy trial attaches, its protection continues until the defendant is tried or is no longer in legal jeopardy. *Ford*, 316 Kan. at 561. In situations where the State has filed a complaint, dismissed it, and then filed another complaint, courts will consider the time before dismissal and the period after the charge was reinstated to constitute the applicable length of delay if (1) the first case was not dismissed because of necessity and (2) a charge in the first case is identical to a charge in the second case. *Gill*, 48 Kan. App. 2d at 113-14 (citing *United States v. MacDonald*, 456 U.S. 1, 8, 102 S. Ct. 1497, 71 L. Ed. 2d 696 [1982]).

Both conditions are met here. The State does not assert that the dismissal of the first case was necessary. And the criminal-damage-to-property charge dismissed in the first case was identical to the criminal-damage-to-property charge in the second case.

And the State concedes that the delay of 38 months from arrest to trial was sufficient to raise concerns regarding Oakley's constitutional right to a speedy trial. This factor weighs in Oakley's favor.

*Reason for the delay*

Having concluded that the pendency of Oakley's case gives rise to speedy-trial concerns, we must next consider the reasons for that delay. The Court's decision in *Barker* helps define the contours of this analysis. For example, a "deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government." 407 U.S. at 531. "A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." 407 U.S. at 531. But "a valid reason, such as a missing witness, should serve to justify" some appropriate delay. 407 U.S. at 531. And when a defendant's actions were the "'primary cause of the delay,'" the court may conclude that this factor "'weighs heavily against'" the defendant. *Owens*, 310 Kan. at 876; see *State v. Davis*, 277 Kan. 309, 336, 85 P.3d 1164 (2004).

Our review of the timeline here shows that many of the delays in this case were the result of Oakley's requests. Oakley's preliminary hearing on the original criminal-damage-to-property charge was delayed for 71 days (from February 12 until April 23, 2020) to accommodate Oakley's work schedule. When the pandemic intervened, Oakley requested an in-person preliminary hearing, resulting in a delay of almost a year (from July 16, 2020, through June 30, 2021). Over the next several months, the State and

9

Oakley both requested continuances of the preliminary hearing—whether to allow for unavailable witnesses or to provide an opportunity for the parties to present additional evidence. At least 57 days from June 30, 2021, through the conclusion of the preliminary hearing on February 16, 2022, are attributable directly to Oakley; we also recognize that Oakley requested an additional 90-day continuance on the first day of the preliminary hearing, though the district court denied that request. And based on Oakley's request, his jury trial was delayed an additional 112 days in 2022. All told, the delays attributed to Oakley resulted in a delay in proceedings of over a year and a half.

This is not to say that the State's requests did not also result in significant delays throughout the case. The State requested continuances to accommodate witnesses' schedules and to address a family emergency, and these combined requests cumulatively delayed the court process by over seven months.

We are also mindful that the circumstances of the pandemic itself likely resulted in a more protracted delay, extending these timeframes beyond what the parties' requests might have otherwise caused. For example, it would be rare in non-pandemic times for a request for an in-person preliminary hearing to result in a yearlong delay. We do not fault Oakley for requesting an opportunity to have witnesses at his preliminary hearing testify in person. But the reality is that this delay resulted from his decision.

On the whole, we conclude that the second *Barker* factor weighs against Oakley because much of the delay in conducting the case was caused by Oakley's actions.

*Consistency and timing of asserting the right*

Under the third *Barker* factor, the court considers when and how the defendant asserted the right to a speedy trial. 407 U.S. at 531. Much of this factor's weight depends on the timing of the assertion. See *State v. Rivera*, 277 Kan. 109, 117-18, 83 P.3d 169

(2004). For example, if the defendant failed to assert this right at all, this factor would weigh heavily against them. *State v. Fitch*, 249 Kan. 562, 565, 819 P.2d 1225 (1991). If the defendant only asserted this right shortly before trial "when little more could be done to speed up the process, and only after repeatedly causing and requesting continuances," this factor will not "weigh against the State." *State v. Kellner*, No. 125,086, 2024 WL 208192, at *11 (Kan. App.) (unpublished opinion), *rev. denied* 318 Kan. 1088 (2024); see *State v. Contreras-Avila*, No. 125,485, 2024 WL 4002824, at *8 (Kan. App. 2024) (unpublished opinion) ("[A] late motion to dismiss asserting the right caused this factor to not weigh as heavily in the defendant's favor.").

Oakley did not specifically assert his constitutional right to a speedy trial in this case until filing his motion to dismiss in January 2023—about a month before trial and more than three years into the proceedings.

Oakley nevertheless argues that he consistently attempted to move the case along, beginning with the arraignment in March 2022 when he requested a jury trial. But our review of the record shows that the discussion at that hearing concerned only scheduling a jury trial and any deadlines for motions in limine—it did not mention Oakley's concern that his right to a speedy trial was in jeopardy. And a few months later, Oakley later requested a 90-day trial continuance to finish reviewing the evidence and preparing for the case. At that time, the district court asked Oakley if he was waiving his speedy-trial right, and Oakley responded, "Yes." Even if Oakley was referring to his statutory right to a speedy trial, the record does not show that Oakley consistently asserted his constitutional right to a speedy trial.

Oakley also notes that he objected to the State's last two requests for continuances in December 2022 and January 2023. The district court granted the State's request in December over Oakley's objection (when the prosecutor experienced a family

emergency) but denied the State's second request. The December objection, however, did not mention Oakley's speedy-trial right.

Thus, Oakley did not assert his right to a speedy trial until more than three years had elapsed. We weigh this factor against Oakley.

*Prejudice*

The final *Barker* factor considers whether the delay adversely affected the defendant in a meaningful way or affected their ability to present a defense. 407 U.S. at 532. It is the defendant's burden to establish actual prejudice. *State v. Dunklin*, No. 126,546, 2024 WL 5002054, at *6 (Kan. App. 2024) (unpublished opinion), *rev. denied* 320 Kan. 864 (2025). A defendant can do so in three ways—by showing they were subject to oppressive pretrial incarceration, by demonstrating they suffered anxiety or concern that is distinguishable from similarly-situated defendants, or by demonstrating that the delay impaired their defense. *Barker*, 407 U.S. at 532. A defendant can show heightened anxiety or concern by providing something like a "doctor's or therapist's note." *Contreras-Avila*, 2024 WL 4002824, at *9. And a person might show the delay impaired his defense by establishing that one of his witnesses died, disappeared, or is unable to accurately recall certain events. *Barker*, 407 U.S. at 532.

Oakley does not argue that the delay impaired his defense in any way. He only argues that he was prejudiced by the oppressive length of pretrial incarceration and that this caused him substantial anxiety and concern. It is true that Oakley remained in custody for much of the time between his arrest and trial. But this delay was caused in large part by his own actions. While we do not doubt that Oakley suffered anxiety and concern while he was incarcerated, he offers no evidence that this anxiety was distinguishable from other similarly situated defendants. Oakley has not demonstrated that he was actually prejudiced by the pendency of the case.

*Conclusion*

Balancing all these factors, we find that Oakley has not demonstrated that the time taken to try this case violated his right to a speedy trial. There is no question that the timing of this case—commenced right before the pandemic—resulted in significant delays that were outside anyone's control. But many of those delays were caused by Oakley's decisions. Oakley did not communicate his concerns about the effect of the delay on his constitutional right to a speedy trial until more than three years had passed. And Oakley has not demonstrated that this delay affected his ability to present a defense or otherwise try the case in any tangible way. As such, the district court did not err when it denied Oakley's motion to dismiss on constitutional speedy-trial grounds.

2. *The district court did not err in denying Oakley's motion for a new trial.*

Oakley next argues that the district court erred when it denied his motion for a new trial. In particular, Oakley argues that the State violated his right to a fair trial when it mistakenly published an unredacted version of his interview with police in which he referenced a past DUI and when Jane's mother testified that "he had physically abused [her] while she was pregnant."

*Additional facts relevant to this issue*

About eight months before his trial, Oakley filed a motion in limine seeking to prohibit any mention of his past convictions or arrests. In its response, the State argued that it should be able to present evidence that Oakley had received a DUI—something that he mentioned during his interview with police—because it explained some of Oakley's actions in December 2019. The district court granted Oakley's request and ordered the State to provide a redacted version of his interview to Oakley before trial.

During Oakley's trial, the State asked the responding police officer why Oakley was unable to leave the house in his truck after the incident. Oakley objected, arguing that the answer would violate the motion in limine. The court overruled his objection, and the officer testified that Oakley was unable to leave in his truck because it had an "interlock device," which is a device that is attached to a person's car if they "received an alcohol offense or DUI." This interlock device requires the person to provide a "clean breath sample" before the car would start. And because Oakley was drinking that night, he was unable to start his truck.

Before the court admitted into evidence the recording of Oakley's interview with police, Oakley objected "based on the reasons laid out previously." The court overruled the objection, and the State published an unredacted version of the recording.

At the end of that day of trial, the court noted that "during that video . . . Mr. Oakley made reference to a DUI that . . . probably should have been redacted from that video." Both parties agreed that this was a mistake. But Oakley's counsel stated that he did not know whether "that particular piece of evidence is terribly prejudicial to [Oakley] in light of the Court's ruling that an Interlock device was mentioned and was admitted." Nor did counsel request a limiting instruction, explaining that he did not want to "draw attention to [the DUI] again."

Later in the trial while Jane's mother testified, the State asked her what her relationship with Oakley had been like before the incident in December 2019. She answered: "We had fights sometimes that would get out of hand and be very verbal and aggressive, but we never really had anything physical except for one time when I was pregnant, but we were happy."

Oakley objected, arguing that this testimony violated the motion in limine that prohibited any mention of his prior bad acts. He also moved for a mistrial, arguing that

14

this reference to violence while the mother was pregnant was so prejudicial that it made it impossible for him to receive a fair trial. The court sustained the evidentiary objection but denied Oakley's motion for a mistrial.

During a break in the proceedings, Oakley renewed his request for a mistrial. He argued that the "allegation that [he] beat up his pregnant wife or fiancée . . . is extremely prejudicial . . . , is inflammatory, and is likely to taint the present jury panel." The State argued that the court was right to sustain the objection, but the mistrial was unnecessary because the comment was "very brief, minor, and very undefined." Oakley then clarified that he had not requested a limiting instruction and he was not seeking one now because he believed it "would just draw attention to the negative implications of that evidence." The court denied Oakley's motion for a mistrial.

After the verdict, Oakley filed a motion for a new trial, alleging that he was entitled to a new trial due to the publication of the unredacted interview and the mother's suggestion that Oakley "was a bad person who would be physically abusive to a pregnant woman." After hearing the parties' arguments, the court denied the motion. The court found that the DUI evidence did not affect the outcome of the trial considering the entire record and thus did not violate his right to a fair trial. Similarly, the court found that the testimony of Jane's mother was "inconsequential" given its context. Oakley challenges both conclusions on appeal.

*No abuse of discretion*

An appellate court reviews the district court's denial of a motion for a new trial for an abuse of discretion, which occurs when the district court's decision is based on an error of fact or law or if it is unreasonable. *State v. Davidson*, 315 Kan. 725, 728, 510 P.3d 701 (2022). Oakley bears the burden of showing that the district court abused its discretion. *State v. Dean*, 310 Kan. 848, 856, 450 P.3d 819 (2019).

A district court may grant a new trial if it is "required in the interest of justice." K.S.A. 22-3501(1). Essentially, the district court must determine "whether the challenged event deprived [the defendant] of a fair trial." *State v. Harris*, 313 Kan. 579, 585, 486 P.3d 576 (2021). To be entitled to a new trial, there must be a reasonable probability that an error affected the trial's ultimate outcome. See *State v. Edwards*, 311 Kan. 879, 888, 467 P.3d 484 (2020). A reasonable probability is one sufficient to undermine an appellate courts' confidence in the outcome. *State v. Rodriguez*, 302 Kan. 85, 93, 350 P.3d 1083 (2015).

Oakley first argues that the State deprived him of a fair trial when it mistakenly published the unredacted recording of his interview with the police. He argues that this undermined his credibility with the jury because it suggested that Oakley "had a history of drinking and then committing crimes." And this is especially so, he argues, because only he and Jane were present in the bathroom and "able to tell the jury what had happened," and so Oakley's credibility was critical to his defense.

But this argument is unpersuasive. The district court's conclusion that this evidence did not affect the outcome of the trial was reasonable. Oakley's attorney acknowledged that he was not sure whether the mention of the DUI during Oakley's interview had much of an effect "in light of the Court's ruling that an Interlock device was mentioned and was admitted"—a ruling Oakley does not challenge on appeal. And while the district court did not admonish the jury to disregard the information regarding Oakley's DUI—a decision approved by Oakley himself—the court later instructed the jury that "[e]vidence of any alleged crime committed by the defendant, other than related to the present charges, should not be considered in your deliberation." Jurors are presumed to follow these instructions. *State v. Alston*, 318 Kan. 979, 990, 551 P.3d 116 (2024). Nothing suggests the jury failed to follow that instruction here.

Oakley also claims that the testimony of Jane's mother deprived him of a fair trial because "the evidence that he had been physical with his pregnant romantic partner also hurt the jury's impression of his character, again making them less likely to believe him." The district court sustained the objection to this statement but denied Oakley's request for a mistrial based on its utterance.

Although we agree that this statement did not reflect well on Oakley's character, the comment was narrow and fairly vague, made only once off-handedly, and not emphasized by either party; Oakley himself requested the court not provide any limiting instruction in order to minimize the comment's effect. And the district court sustained Oakley's objection to the comment and later instructed the jury that it "must disregard any testimony or exhibit which I did not admit into evidence." See *Alston*, 318 Kan. at 990. Considering the multiple days of trial testimony, the district court's conclusion that the comment was "inconsequential . . . in context of the whole trial" was not unreasonable.

Thus, Oakley has not demonstrated that the district court abused its discretion when it denied his motion for a new trial.

Our courts have frequently emphasized that no trial is perfect. Judicial proceedings are conducted by parties and rely on people who have conflicting schedules. Witnesses can be unpredictable, and mistakes can happen. And sometimes, events completely outside the parties' control—such as the pandemic here—uproot our expectations.

But a defendant is entitled to a fair trial, not a perfect one. *State v. Cruz*, 297 Kan. 1048, 1075, 307 P.3d 199 (2013). After carefully reviewing the record and examining Oakley's arguments in context, we conclude that the proceedings in this case did not deprive Oakley of a fair trial. We thus affirm his convictions.

Affirmed.

17